### UNITED STATES v. NOSAL

### DECLARATION AND EXPERT REPORT OF JOHN D. O'CONNOR

### I.    WITNESS BACKGROUND AND QUALIFICATIONS

I, John D. O'Connor hereby declare and state as follows:

I am an attorney and licensed to practice law in all courts in the State of California, and have been so licensed since December 1972. I am currently the principal of O'Connor and Associates, a law firm consisting of myself and several associates that engages in business litigation. I have forty-one years of significant trial experience, including current jury trial experience. In addition to my litigation practice, I have been retained as an attorneys' fee expert on approximately fifty occasions, and served as a consulting expert on many more occasions.

The following is a brief summary of my background and qualifications.

I attended The University of Notre Dame in South Bend, Indiana, where I graduated *magna cum laude* in 1972, where I was a member of the Order of the Coif and Associate Editor of the Michigan Law Review. I was admitted to the California bar in 1972.

After being admitted to the California bar, I held numerous positions at private law firms where my practice focused on trial litigation. In 1972 and 1973 I was an associate with the trial firm of Belli, Ashe and Choulos, where I assisted Mr. Melvin Belli in the trial of several large cases, and tried three cases on my own. From January 1974 through December 1979, I was an Assistant United States Attorney for the Northern District of California in San Francisco. In that capacity, I tried white-collar criminal cases as well as a variety of civil matters. In 1980 and 1981 I was a senior associate at the prominent San Francisco firm of Brobeck, Phleger and Harrison.

From 1982 through 2001, I was a principal and managing partner of the law firm of Tarkington, O'Connor & O'Neill, where our clients were mainly insurance companies, corporate risk management departments, and governmental entities, such as the FDIC, FSLIC, RTC, NCUA, and the United States government. From late 2001 through July 2006, I was employed with the San Francisco firm of Howard Rice as a Special Counsel and Director, practicing within

the litigation department. At Howard Rice, litigation work consisted of business litigation, tobacco defense litigation on behalf of R.J. Reynolds Tobacco Company, intellectual property litigation, and a variety of commercial cases. At Brobeck, Tarkington, Howard Rice, and O'Connor, I have had extensive experience in cases involving alleged trade secret misappropriation by departing employees.

Since July 2006, I have practiced on my own with several associates under the name of O'Connor and Associates. My practice continues to focus on complex business litigation, including an active trial practice. In my career I have tried over seventy civil and criminal cases in state and federal jurisdictions throughout the country. I have tried over fifteen criminal cases, most in federal court.

In 1982 I began managing the Tarkington office and as our firm quickly grew to over eighty lawyers, I regularly kept abreast of billing standards in the community, and regularly subscribed to specialized publications geared to law firm management, such as the Altman and Weil annual reports and the monthly published Partners' Report. I as well regularly reviewed more widely published legal periodicals.

As written billing guidelines became in vogue for institutional clients in the mid-eighties, I participated heavily in working with our institutional clients in government, insurance and other large businesses to establish and implement practical billing standards. I regularly consulted with these clients about their perception of the positive and negative in our billings, and where appropriate, remedied the same.

I have kept abreast of the billing rates in the Bay Area, California, and generally throughout the country since 1982. Because we represented clientele in different business and governmental sectors, it was important to me to be conversant about rates throughout the litigation field ranging from premium to lower, more commoditized rates.

Because our practice at the Tarkington firm often involved coverage, legal malpractice, and reinsurance and excess monitoring work, we reviewed the billings of a wide variety of firms in our regular practice, including premium-rate billings, lower, highly negotiated insurance

2

defense charges, and standard business litigation charges with rates falling between these two groups.

At Howard Rice, we kept informed about both premium rates in the area and rates charged by the wider, more market-driven business firms, so that we could in turn appropriately set ours on an annual basis. Because we did work throughout California, our surveys involved both Northern California and Southern California, and well as national firm premium rates. It has been my experience that the rate structure of the San Francisco Bay Area is virtually identical to that in the greater Los Angeles area.

In addition to my extensive trial practice, I have been retained as a fee expert on approximately fifty occasions, and have acted as a consultant on many more occasions. In addition, I have significant experience dealing with complex attorneys' fees issues in other contexts, such as litigating fees in a number of civil rights and other "fee shifting" cases, and being charged by the United States government, as an Assistant U.S. Attorney, to assess and negotiate significant class counsel fees for several different firms who had pursued and obtained a settlement in a very large, class action labor discrimination case against the Naval Air Rework Facility in Alameda.

Although I have been involved in a significant amount of legal fee review, negotiation, and litigation since 1977, my involvement in legal fee dispute work increased significantly in 1989. In that year, I was the Tarkington partner in charge of our work with failed and failing financial institutions on behalf of the FDIC, FSLIC, RTC, and NCUA. At that time, we had performed extensive work in connection with the failed Golden Valley Bank, Turlock, California, then in Receivership under the aegis of the FDIC. The insurance carrier for the bank insisted that we advise the government to release the insurance carrier from its defense obligations with a nominal payment. After our refusal, the insurance company subjected the Receiver and our firm to numerous audits in an unsuccessful attempt to force the government to release the carrier from its obligations. At this point I necessarily became immersed in the various billing standards prevalent in the community.

During these years of legal fee disputes, I spent the majority of my time dealing with the developing field of legal "auditing" and related litigation. As a result, I gained a wide knowledge of auditing practices, prevailing billing standards, and approaches employed by legal fee experts, auditors, and litigators.

Because our litigation with the carrier and its auditors were widely known in the legal community now confronting fee auditors, during the years 1991 through 2001, I consulted with numerous law firms throughout the country who were seeking my advice on audit criticisms leveled against their practices, almost invariably involved in large fee disputes. I also consulted less frequently, but on numerous occasions, with fee payors in fee disputes. I continue this work as a subspecialty of my litigation practice through the present time. I am a member of and lecture before the National Association of Legal Fee Attorneys, a society dedicated to both continuing education and development of legal fee billing standards.

In 2005-2006, I served as a JAMS arbitrator on an asbestos fee dispute involving over $2 million in billings.

I have been retained on over 50 occasions to provide written and/or oral opinions. For example, in 2010, I was an attorneys' fees expert retained by class counsel in *Duran v. U.S. Bank*, an employment class action case tried before Honorable Robert J. Freedman, Alameda County Superior Court, in which class counsel was awarded $18.8 million dollars. Judge Freedman based certain findings favorable to class counsel on "persuasive expert testimony expressed by John D. O'Connor."

I recently testified in a trial in San Francisco Superior Court, <u>J.R. Marketing, L.L.C. v. Hartford Casualty Ins. Co.</u>, Case No.: CGC-06-449220, and was accepted as a qualified expert my Judge Lynn O'Malley Taylor. In that case I testified regarding $12,000,000 in legal fee billings allegedly payable by an insurer for defense work by a national law firm. Recently I submitted an expert opinion by Declaration in opposition to a motion for fees by class counsel in <u>Moore v. Verizon</u>, Case No.: 09-1823 SBA (JSC), heard before Judge Jacqueline Scott Corley.

For approximately four years, from January 1974 through the end of 1977, I carried a criminal case load as an assistant U.S. attorney for the Northern District of California. In 1978 and 1979 I carried a case load consisting primarily of Civil Division work, although through my close association with Criminal Division prosecutors, I kept abreast of developments of that section of our relatively small office.

I was and still am aware of communications and assistance between, on the one hand, criminal victims of white-collar crime, on the other, and the prosecutors of these crimes.

I do not presently consider myself a specialist in criminal defense work. I have defended two parties in federal criminal matters in the past year, one a defendant in a case in the United States District Court for the Eastern District of California, and one potential target in a San Francisco federal investigation. I note this only to demonstrate that I have a general knowledge of the federal criminal process to this day.

Based on the foregoing, I consider myself to be an expert capable of assessing the reasonableness of litigation fees in complex litigation.

## II.    COMPENSABILITY STANDARDS

Our assigned task is the analysis of over $900,000 in legal bills claimedly paid or owed by Korn Ferry International ("KFI") to O'Melveny & Myers ("OMM"), KFI's attorneys. KFI seeks restitution from Defendant David Nosal under the victim's restitution provisions of the MVRA. While the undersigned and other legal fee analysts often examine the reasonableness of legal fees in particular contexts, usually litigation, this assignment is unusual in that the fees here must be incurred, we understand and assume, as a necessary result of the victim's foreseeable participation in prosecution of Defendant's criminal conduct. We distinguish this analysis, then, from the more normal context in which all fees are related to the litigation and are all compensable to the extent reasonable and necessary. Put differently, merely because KFI reasonably incurred legal fees for certain activities related to Nosal does not mean that Defendant Nosal is responsible under his restitution obligations to repay KFI for those charges.

It is our understanding, based upon the briefing we have reviewed of Defendant's attorneys, that the charges must be for services that are a "reasonably foreseeable" result of the Defendant's criminal conduct. These fees themselves must be "reasonable" and must be a "necessary" part of the victim's "participation" in the criminal proceedings. One example of a reasonable and necessary cost related to such foreseeable participation would, in our opinion, be transportation costs for an assault victim to travel to court to appear as a witness, and perhaps also wages lost because of such an appearance.

The task of determining the propriety of "participation" costs becomes more difficult when the victim is a corporation, the corporate interests or property harmed have in part intangible characteristics, and it is not always clear when a corporate representative such as an attorney is acting as a "victim" and not as an advocate for the victim.

Certainly it can at least be argued that it would have been reasonably foreseeable that a corporate victim would need to determine what property has been stolen or damaged; to make efforts to restore or ameliorate the property lost or damaged; to respond to prosecutors' requests to produce documents and witnesses as necessary for the prosecution of the crime; and to cooperate with the prosecution in detailing loss for the Court and its offices in a post-trial sentencing phase.

The first question that arises is whether such foreseeable "participation" requires the use of attorneys at all in the case of a theft of confidential trade secrets, which we understand to be the property stolen in this case. The negative view would argue that the corporate employees responsible for dealing with these lists are fully capable of traveling to Court unaccompanied by lawyers; providing documents requested by the prosecution; computing financial loss; and informing prosecutors of any burdens or hardships in responding to any document requests from the Defendant. The contrary view would hold that because a criminal prosecution such as this would usually be considered by a corporation to be a "legal" matter, corporate counsel would normally be the interface with any government agency or prosecutor dealing with the matter, and

6

therefore it would not be unreasonable for the corporation to participate in part through its attorneys.

In preparing this analysis, we assume that at least some part of fees for such "participation" by attorneys are compensable to KFI as restitution in a criminal prosecution such as this, even though we understand this contention is very much in dispute.

This is not to say, however, even under the latter view that any actions undertaken by a corporation's lawyer falls within the ambit of "participation" for which restitution should be awarded. Often, as in this case, a victim corporation may pursue a parallel civil action, as one would expect, for instance, in the case of a criminal anti-trust victim. Surely, the "victim" should not receive attorney's fees incurred primarily for helping the government prove an element of its civil case through the collateral estoppel effect of a criminal conviction. Likewise, in the instant trade secret theft case, KFI has a civil litigation interest in the criminal prosecution. In such cases where the lawyer is acting as an advocate, not as a victim, these activities are not a "necessary" aspect of victim's participation.

In this case, there is also an obvious competitive motive underlying KFI's actions, since Defendant Nosal's business, Nosal Partners, has proved a significant competitor of KFI, and Nosal was apparently a formidable producer of business while at KFI. We understand that as we speak, both businesses continue to vie for many of the same clients.

Moreover, David Nosal by all accounts had high visibility throughout the corporation. We have experience representing corporate victims of alleged unfair competition caused by departing employees. In such cases, the desire to "send a message" to existing employees often animates a corporate strategy of highly visible legal activity directed against a departing employee. This is a legitimate corporate strategy, in our view, but not necessarily one for which the corporation should receive recompense as a victim of a crime.

Both strenuous civil litigation and vigorous advocacy in support of criminal prosecution are appropriate, perhaps laudable, corporate activities. But they are not made "necessary" by the

criminal conduct. They should not, therefore, without more, be considered the basis for recovery of legal fees expended in pursuit of them.

Accordingly, in this Report we will analyze the following:

1. What reasonable rate should be assessed for legal time falling within the provisions of the MVRA?

2. What activities of the victim's lawyers should be included in or excluded from the analysis as a basis for recompensable legal "participation?"

3. To what extent should legal activities otherwise compensable be reduced to reflect reasonable billing rates, reasonable efficiency, and provable connection to the criminal counts not dismissed?

4. When activity description is so vague that its nature and purpose cannot be determined, such that the billing entry is otherwise non-compensable, what are reasonable estimates of time necessary to perform compensable tasks that may have been performed?

## III.    LEGAL FEE ANALYSIS

### A. Appropriate Billing Rate

Korn/Ferry International ("KFI") has retained an excellent law firm, O'Melveny & Myers ("OMM"), to pursue its legal interests in connection with Defendant Nosal and Nosal Partners. OMM's activities have not been limited to interaction with the criminal prosecution, and the firm has as well appeared in the civil litigation, apparently both in Court and in Arbitration.

OMM's rates reach as high as $1,100 per hour. Its lead partner on the matter, Mark Robertson, bills presently at $756 per hour, a rate that is risen steadily from his $460 per hour rate in 2005, when he was a six-year lawyer, while Sharon Bunzel, a nineteen year lawyer, presently bills at $787.50 per hour. When paralegal rates are included, the average hour billed over these nine years has been approximately $570. When paralegal rates are not included, the average billed hour exceeds $600.

Such an average charge would be high relative to the legal market even if all hours were billed in 2013 at 2013 rates. Given that these charges began in 2005, we can safely say they are at the very top of the market. These rates can be described not only as "premium" as compared to other large firms, but also perhaps as "premium premium," that is, higher than other firms charging premium rates.

These rates are generally 35% to 100% higher than the market for reputable business litigation firms not in the premium category. For example, excellent San Francisco firms such as Cooper, White & Cooper, Hanson Bridgett, Sedgwick LLP, and Nossamen, Gunther & Knox would charge a top rate of approximately $450 per hour for a litigation partner, with other rates stepping down from that level. A junior or midlevel partner would charge an average $375 to $400 per hour. For various reasons, we do not feel that these rates are appropriate in this case, for reasons to be elaborated. However, if the Court did determine that KFI should receive compensation at prevailing rates for excellent business litigation firms, OMM's rates should be reduced by 40% across the board. These premium OMM fees would be justified only in a case calling for premium niche skills and/or plentiful firm resources, where purchasers of legal services in the applicable market sector would customarily pay these rates. These "premium" rates are certainly not warranted here for victim's "participation" even if they are appropriate for the related civil litigation.

It would not be unusual for a client such as KFI to retain OMM at its premium rates for civil litigation which it deems to be critical or requiring "niche" specialty skills. OMM has a reputation for excellence, indeed, for being a "cut above" other major firms, and success in the *Nosal* civil litigation is obviously an important goal for KFI. And since the criminal prosecution deals with the same subject as the civil matter, KFI may reasonably decide that OMM's work in aiding the criminal prosecution will aide KFI's civil litigation.

But, in spite of the above, there appears to be no necessity to retain a premium-priced litigation team merely to participate in this criminal proceeding. The major tasks that KFI would

anticipate performing as a victim would be providing the prosecution with documents, the identities of witnesses, information about the crimes, and similar and related tasks.

This work would not call for premium litigation skills or any recondite knowledge. To adequately participate in criminal proceedings, the victim's lawyer, if legal services are indeed necessary for participation, need not be a skilled cross-examiner, or an experienced deposition taker. Nor need the lawyer be a skilled legal researcher and writer. In fact, most of the foreseeable tasks would not appear to require a legal background at all. And for some of the tasks, only a rudimentary knowledge of the legal process would be required, such as a basic understanding of the attorney-client privilege, the nature of a trade secret, and the process of preparing a witness Declaration. In our experience no Assistant U.S. Attorney needs or desires memoranda or draft cross-examinations prepared by the victim's lawyer, and I know of no federal prosecutor who has actively sought same.

The most appropriate individual to perform these tasks of a legal nature, in our opinion, would be a mid-level lawyer with KFI's General Counsel's office. Such a lawyer would have easy access to KFI documents and employees, and as well an understanding of KFI's business model. Only one person from that office would in most instances be needed, and if another person were needed, it would seem that the need could be filled by another middle or lower level department lawyer or paralegal. The rate for such a lawyer in our opinion would appropriately be approximately $250 per hour, calculated roughly at $100 to $125 per hour for overhead and $125 to $150 per hour for compensation. This is a healthy and quite sufficient rate for competent in-house counsel, albeit not the General Counsel himself, who should bill around $300 to $350.

As a check on the above opinion, we note that a competent senior associate or junior partner at a reputable employment law firm would have been available throughout this time period at $250-$300 per hour, and would be more than competent to execute any necessary tasks. Excellent management-side employment firms, such as Jackson Lewis, Littler Mendelson, and Fox & Rothschild often publish rates for litigating senior partners as high as $450-$550 an hour, but actually charging these rates is more the exception than the rule. With the great bulk of cases

at these firms, it is common to find full partners charging $275-$325 per hour. A commonly charged rate for an experienced senior associate or junior partner would be $250, with the rate changing little over time because of increased competition.

Alternatively, we note that a highly experience CJA panel lawyer is paid $120 per hour and such a lawyer would also be appropriately assigned to the tasks here involved. We hesitate to use this rate because it is, in our opinion, unreasonably low. It takes advantage of the public spirit of the panel lawyers and often represents a marginal wage for lawyers who pay their overhead and more deserved compensation with higher fees from paying clients. When we adjust this rate to reflect fully-costed overhead, we again conclude that a $250 rate is appropriate for a CJA-level lawyer.

This rate is also considered a premium rate for excellent insurance and municipal defense litigation firms, firms representing labor unions, as well as firms providing legal services to the risk management departments of large corporations. Many of these lawyers are assigned to cases very similar to the civil litigation between KFI and Nosal, and in a recent case on which we worked, involving alleged trade secret theft by a departing party, a prominent national defense firm charged a rate of $235 per hour. In short, we think a $250 an hour rate is a reasonable rate in the marketplace for the services here required.

We note parenthetically that OMM provided a number of services that do not appear to be recompensable under the MVRA's restitutionary provisions. These include the drafting of cross-examination questions in the assistance of the prosecutor; lobbying the DOJ to prosecute Nosal, and writing various legal memos, again, apparently for the assistance of the prosecution and/or to pursue a conviction that will aid civil litigation. KFI may well have determined that these services should be performed by a premiere firm such as OMM, who KFI would perceive to be a cut above the firms in the market. But the decision to pay for these premium, heavily-staffed services would be for the corporate purposes of KFI quite apart from the needs of KFI as a victim of a crime.

**B. Billings Unrelated to Criminal Conduct**

11

After the *remittitur* of the Ninth Circuit's decision, all of the billing entries are claimedly and presumably connected in some way to criminal conduct, albeit perhaps not compensably so.

But prior to the *remittitur*, fourteen counts of criminal charges were being pursued by the government, charges which were ultimately ruled not to constitute criminal conduct. Indeed, since much of KFI's billings related to the pre-indictment time period, when KFI may have been advocating for criminal charges even in addition to the 20 counts charged, clearly a portion of its activities related to Nosal's conduct adjudged by the government or by the Court not to be criminal.

As we note elsewhere herein, the billing descriptions submitted by OMM are grossly inadequate, and the putative payor of fees cannot reasonably discern the nature of the services for which Defendant is being charged, or, most importantly, whether the activity relates to criminal conduct of the Defendant. It certainly is so that we cannot determine from the billings the activities of Defendant Nosal that KFI and/or the prosecution are addressing with regard to any listed activity. For example we cannot discern the subject matter or nature of these communications:

| Date | Name | Description | Hours | Amount | Category |
|------|------|-------------|-------|--------|----------|
| 07/28/05 | Robertson, M | Conference with Sung-Ki Lim (.1); Draft email to Sung-Ki Lim responding to information requests (.5); Conference with D. Demeter regarding issues raised by FBI (.2); Conference with Sung-Ki Lim regarding strategy (.3); Conference with Sung-Ki Lim (.2) | 1.30 | $598.00 | 1 |
| 08/09/06 | Robertson, M | Review and analyze documents in conjunction with issues/questions raised by C. Sadlowski (.6); Conference with C. Sadlowski regarding various issues related to investigation (.5); Review and analyze documents based on questions raised by C. Sadlowski and draft email regarding conference with C. Sadlowski (.9) | 2.0 | $891.00 | 1 |
| 10/23/06 | Robertson, M | Review and analyze emails in response to request from C. Sadlowski (.4); Conference with C. Sadlowski regarding investigation (.2); Conference with M. Briski regarding issues raised by C. Sadlowski (.2); Review and analyze documents and emails in response to issues raised by C. Sadlowski (.9); Review and analyze documents and emails in response to requests for information for C. Sadlowski (.7) | 2.40 | $1,069.20 | 1 |

By way of another example, prior to the interlocutory appeal, OMM billed for work in response to Nosal's motion for a 17 (c) subpoena. Some attorney costs responding to such a request may be chargeable to Defendant, if we accept the premise that attorney's time in such "participation" is generally compensable. But such costs should be limited to those involving criminal conduct only, and not to charges ultimately held non-criminal. Admittedly the original 17(c) subpoena covered requests related to conduct ultimately found not to be criminal.

So separate and apart from any analysis of the reasonableness of the fees charged, the necessity of the tasks performed, the firm's staffing and efficiency of work, we must come to some method of separating the criminal wheat from the non-criminal chaff as to the pre-2012 period.

Because of the absence of clear description in these billings, we must design some admittedly imperfect formula for assessing proper restitution for any OMM activity which could be addressing both criminal and/or non-criminal conduct. The fairest method would seem to be dividing these fee charges in the same proportion as the ratio of criminal to non-criminal conduct. Since 70% of the criminal charges were dismissed, that is, 14 of 20, it is our opinion that any time and charges that appear otherwise allowable should be reduced by 70% for activities prior to 2012, when the case appears to have been remitted absent the improper criminal counts. This reduction is especially warranted because of the significant "lobbying" and advocacy suggested by the bills.

Put differently, OMM has submitted charges encompassing 1700 hours. Even if all of the charges would otherwise have been a proper basis for restitution to the victim of criminal conduct, those hours should now be reduced by the pre-2012 70% reduction, down to approximately 1200 hours.

If a flat rate of $250 per hour were applied to these hours, the total fees would thus amount to approximately $300,000. However, most of these charges are not compensable, and the amount which in our opinion constitutes appropriate restitution is significantly lower, as we will now explain.

### C. Requisite Detail and Particularity of Task Descriptions

It is a widely accepted billing standard that a firm must detail its charges to the fee payor with sufficient detail, and describe the services for which payment is sought, so that the payor can reasonably determine the services for which payment is sought.

A billing entry which does not meet this standard is considered excessively "vague," relieving the payor of the obligation to pay, or at least raising sufficient questions such that further documentation and explanation is needed. Numerous federal cases have refused to grant fees to prevailing parties when the billing descriptions are vague and insufficiently detailed such that it is not clear which services are being performed, or that the amount of time is reasonable.

The United States Supreme Court has stated "[t]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Furthermore, courts have the authority to cut unnecessary hours where it determines that the hours expended are excessive in relation to the task performed. *Shim v. Millennium Group*, 2010 U.S. Dist. LEXIS 68922, 12-13 (E.D.N.Y. 2010). "When a district court finds the number of hours claimed is unreasonably high, the court has two choices: it may conduct an hour-by-hour analysis or it may reduce hours with an across-the-board cut." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008).

One Federal Circuit Court held, "[t] use of billing practices that camouflage the work of a lawyer does naturally and quite correctly raise suspicions about whether all the work claimed was actually accomplished or whether it was necessary…" *Robinson, et al. v. City of Redmond, et al.*, 160 F.3d 1275 (10th Cir. 1998); see also *Leroy v. City of Houston*, 906 F.2d 1068 (5th Cir. 1990) (plaintiff has burden to show amount of time expended was reasonable, and this showing could not be made without some breakdown as to the separate functions performed and number of hours devoted to each).

In this case, sufficient billing description of the services performed should also fulfill an additional, corollary billing standard, necessitated by the MVRA, which is that the billing entries must show why the billed activity, reasonable or otherwise in amount of time for the task, is in

14

fact related to a claimedly compensable "participation" in the criminal prosecution. By way example, if Mark Robertson billed for meeting with AUSA Waldinger for 3 hours, but the nature of the discussion was not revealed, it may well be that, while three hours is not an unreasonable amount of time for a meeting, we cannot determine whether this meeting constitutes necessary "participation" in the criminal proceedings by the victim.

For example, if Robertson were to meet with Waldinger for the purpose of advocating additional criminal charges he filed against Nosal, or advocating for a reduction in the scope of a government subpoena served upon KFI, these activities may well not be compensable as "necessary." On the other hand, if Robertson were meeting with Waldinger to arrange for the appearance of witnesses and the production of documents, there is a better argument that such a meeting is related to necessary "participation" by KFI in the criminal prosecution of Nosal.

However, for the most part in this case, billings lack descriptions sufficient to show the nexus between KFI's required "participation" in the criminal case and the activities reflected. Put differently, there is some difficulty for the most part showing that the activities described are anything other than voluntary and discretionary activity by KFI, through its lawyers OMM, designed to combat Nosal for civil litigation and/or strategic corporate purposes.

Descriptions sufficient to connect a task to a compensable activity are crucial in this case, because simply assuming such a connection could lead to very unfair results. For example, activities simply complying with a governmental subpoena, or subpoena from Nosal under Rule 17(c) may well constitute reasonable and necessary participation in the prosecution of Nosal. However, imposing attorneys fees on Nosal for KFI's advocacy in resistance to such subpoenae would impose the English Rule, shifting attorneys fees to the losing party.

We note in this regard that Defendant argues that he is not subject to any charges imposed for KFI's production of documents in this case. To do so, Defendant argues, would chill Defendant's Sixth Amendment rights to confront witnesses since requiring payment for fees for such would impose an onerous burden on a Defendant who simply wants documents necessary for his defense.

15

We will not attempt in our role as a fee analyst to decide such constitutional law questions. But if we are tasked with determining what should be foreseeable attorneys fees reasonably and necessarily incurred by KFI for its required "participation" in the criminal proceedings, we would indeed omit attorneys fees incurred in advocacy activities, that is, arguing, analyzing or research what should and should not be produced to Nosal, or negotiations regarding such production and other similar activities.

We would include, on the other hand, fees for document reviews designed to determine subpoena compliance, and fees for the actual act of production of the documents to government or Nosal. We thus would distinguish between OMM's activities merely in "compliance" with a legitimate government or Defendant subpoena or request, on the one hand, or, on the other hand, advocating through OMM for the reduction of scope of a subpoena, articulation of objections to the subpoena, or even a privilege review. Given the distinction in the two classes of activities, it is incumbent upon the party seeking fees to distinguish between legitimate compliance and activities taken primarily for the purpose of pursuing civil litigation and/or corporate competitive strategies.

We also note that KFI conducted its own internal investigation in this case. KFI refused on various grounds to produce documents to that investigation, and were upheld by the Court in its refusal. So, again, whether a particular activity is linked to compliance issues alone or protection of the confidentiality of the internal investigation is a question we would hope to be able to discern from the billing entries submitted, but cannot. Similarly, we observe various entries which could well relate to the civil litigation, which, in our view, does not constitute compensable activity.

We note also the high levels of advocacy and lobbying of the U.S. Attorney and FBI both pre-indictment and prior to interlocutory appeal to the Ninth Circuit, much of which involved what was stated to be "factual investigation," or review of and production of documents. Yet, as we discussed above, much of this activity prior to 2012 presumably related either to charges

16

eventually thrown out or potential charges never filed.  Accordingly, we assume otherwise compensable "participation" by KFI attorneys should be reduced by a formulaic 70%.

A corollary issue arises from the redaction of the bills reflected in the billings submitted, and in the Robertson Supplementary Declaration.  If these redactions were for the purpose removing entries for which KFI is not seeking compensation, that redaction is appropriate.  But, by the same token, such redaction removes context from the billing for which compensation is sought, which makes it difficult, if not impossible, to determine the purpose of the particular activity, an activity which may be understood by entries which were redacted.

Thus, in civil litigation, where all the reasonable litigation activity may be compensated under statute or contract, one would necessarily know the context of a particular activity, or, put differently, the scope of compensable activities would be far broader than in this case.  And yet, in this case, in which context is far more important (because all activity is not compensable, as might be the case in normal fee-shifting civil litigation), the context is not clear.  Indeed, that context has perhaps been removed by "redaction."

Moreover, if "redaction" means or includes changing the entries for which compensation is sought, then such redaction is even more disturbing, because the billing entries would lack candor and honesty.

Finally, we note that numerous memoranda, correspondence, and conferences are sought to be compensated.  Yet, as we understand it, Defendant Nosal did not receive any or all of these items, nor have their contents been disclosed or summarized to Nosal.  In such circumstances, without billing entries showing that these non-disclosed activities are related to necessary "participation" by KFI, it would be our view that compensability has not been shown.

In light of the above, we have attempted the onerous task of combing the somewhat opaque billings to select items where it appears OMM was reviewing documents for production to Nosal and/or the government at the explicit request of the government and/or Nosal.  This approach may admittedly omit some activity in which OMM attorneys were locating or reviewing documents for production to the government, but as to which the billing entries did not

specifically describe same. But this approach will likely over-include activity that is essentially disguised adversarial review of documents designed to fight Nosal, and not engaged in for the primary purpose of aiding the administration of justice.

While, again, there is the question raised by Defendant's attorneys as to whether any expenses should be considered compensable when KFI is merely assisting in its duty as a citizen to cooperate in the administration of justice, we do think, without answering that question, that it is worthwhile to distinguish between activities which are merely compliant with legitimate government and Defendant requests, and those which involve advocacy activities by KFI and/or are driven by civil litigation needs.

### D. Analysis of Potentially Compensable Tasks

As noted above, we cannot opine on matters of law, and whether any attorneys fees are compensable under any circumstances here present, since this is a question of law for the Court to decide, and not for expert opinion. On the other hand, in our opinion as a factual matter, there are certain tasks that clearly do not appear directly related to reasonable and necessary participation in the criminal procedures. There are other sets of tasks such as various forms of document review, that fall into a gray factual area, and in those cases we will attempt quantification of reasonable and necessary time and fees.

We will here classify the areas that we do not believe questionably or arguably fall into a compensable area.

### 1. "Lobbying" for Indictment

Much of the activity in the billings submitted appears to be lobbying and advocacy activity that was not necessary, however beneficial it was deemed to be by KFI. The following are examples of such billings, to which we have appended Defendant's objection categories for ease of reference:

| Date | Name | Description | Hours | Amount | Category |
|------|------|-------------|-------|--------|----------|
| 02/16/06 | Virjee, F | Conference with USA regarding prosecution | 0.60 | $435.00 | 1 |
| 02/16/06 | Robertson, M | Conference with K. Waldinger and F. Virjee regarding case status | 0.70 | $346.50 | 1 |
| 04/05/06 | Virjee, F | Prepare for travel to and from and attend meeting with Ausa | 8.70 | $6,307.50 | 3 |

| Date | Name | Description | Hours | Amount | Category |
|------|------|-------------|-------|--------|----------|
| | | (8.5); conference with P. Dunn regarding same; Conference with J. Kohn regarding Ausa meeting (.2) | | | |
| 04/05/06 | Robertson, M | Prepare for meeting with US attorney's office in San Francisco and travel to same (1.9); Attend meeting with US attorney's office in San Francisco and return travel from same (6.9) | 8.80 | $4,356.00 | 3 |
| 06/23/06 | Robertson, M | Review and analyze documents in conjunction with preparation of summary for US attorney's office (.4); Draft and revise timeline for US attorney's office and review and analyze Jacobson emails in conjunction with same (2.2) | 2.60 | $1,287.00 | 2 |
| 06/26/06 | Robertson, M | Review and analyze documents to provide to the U.S. attorney's office; draft and revise timeline regarding data thefts for US attorney's office (1.7); Review and analyze emails and documents for possible production to US attorney's office (.9) | 2.60 | $1,287.00 | 2; 1 |
| 06/27/06 | Booher, D | Research points for FBI presentation; collect emails proving use of proprietary information | 6.70 | $2,278.00 | 2 |
| 06/27/06 | Robertson, M | Draft timeline for US attorney's office and conference with D. Booher regarding same (.7); Conference with K. Waldinger and C. Sadlowski regarding investigation (.2); Draft and revise timeline for US attorney's office and assemble materials to provide to US attorney's office (1.2) | 2.10 | $1,039.50 | 2;1;2 |
| 12/07/07 | Robertson, M | Conference with K. Waldinger regarding status of criminal investigation (.1); Review/analyze documents and emails in response to issues raised by C. Sadlowski and conference with C. Sadlowski regarding same (.8) | 0.90 | $445.50 | 1 |
| 03/07/08 | Robertson, M | Review/analyze documents in conjunction with addressing issues raised by K. Waldinger (.8); Conference with K. Waldinger and C. Sadlowski and draft emails regarding same (1.5); Conference with M. Briski regarding follow up issue following conference with K. Waldinger (.1); Review/analyze emails in response to additional issues raised by K. Waldinger (.3); Prepare for conference call with K. Waldinger and C. Sadlowski (.5) | 3.20 | $1,785.60 | 1 |

Of course, it is difficult, because of perhaps purposefully vague billing entries, to determine the subject matter of the communications. But we conclude, based on several years of similar billing entries, that government representatives are raising issues with the actions requested by KFI and OMM.

### 2. Assistance with Prosecution

There are numerous entries of OMM acting in aid of the Prosecution, although, to be sure, it is difficult to discern in which instances OMM is attempting to assist the prosecution and in which instances OMM is simply protecting its corporate interests. Below are some examples:

| Date | Name | Description | Hours | Amount | Category |
|------|------|-------------|-------|--------|----------|
| 11/18/09 | Robertson, M | Review/analyze M. Jacobson deposition transcript, M. Jacobson declaration and other materials in preparation for meeting with USAO | 2.00 | $1,251.00 | 3 |
| 03/14/13 | Robertson, M | Prepare for meetings with US attorney's office (.4); Conference with S. Bunzel regarding issues related to representation of KF witnesses at criminal trial (.2); Attend witness prep meetings at KF's offices with US attorney (7.9); | 8.80 | $6,415.20 | 3 |

| | | | | | |
|---|---|---|---|---|---|
| | | Address issues related to representation of KF employees in criminal matter and emails regarding same (.3) | | | |
| 03/30/13 | Robertson, M | Conference with K. Waldinger regarding issues regarding criminal trial (.3); Draft/revise outline of Nosal's themes for prep for witnesses for criminal trial and review/analyze documents in conjunction with same (1.5); Further conferences with K. Waldinger regarding issues related to criminal trial (.4) | 2.20 | $1,603.80 | 1;7;1 |
| 04/02/13 | Robertson, M | Conference with K. Waldinger regarding issues related to the criminal trial (.3); Draft/revise timeline for witness prep and review/analyze emails and documents in conjunction with same; review/analyze additional filings in criminal matter; emails regarding same (1.6); Review/respond to emails regarding criminal matter; review/analyze case law regarding exclusion of witness (.4); Conference with M. Briski regarding documents responsive to Nosal's subpoena (.3); Address issues related to providing documents responsive to Nosal's rule 17c subpoena (.8); Conference with R. Rutledge regarding responses to motion to compel and motion t to exclude (.5); Conferences with M. Briski regarding documents responsive to Nosal's subpoena (.4); Conference with K. Waldinger and M. Briski regarding source lists (.2) | 4.50 | $3,280.50 | 1;7;8;5;5; 8; 5;1 |
| 04/10/13 | Bunzel, S | Attend trial proceedings and meet with KF witnesses (5.6); confer with M. Robertson regarding representation of former director (.3); telephone conference with D. Lowe regarding representation, develop representation documentation for D. Lowe and communicate with defense team regarding representation (1.1); analyze civil complaint and arbitration documents (.9); confer with M. Robertson regarding injunction issues and analyze strategy and communications regarding same (.2); analyze subpoena strategy issues and confer with M. Robertson regarding same (.7); prepare materials for government and analyze same (.8); confer with M. Robertson regarding service issues and research same (.3) | 9.90 | $7,528.95 | 8 |
| 04/12/13 | Bunzel, S | Prepare for argument regarding Korn/Perry documents, meet with M. Briski, and attend trial proceedings (6.5); confer with M. Robertson regarding trial status and strategy issues (.3); analyze defense communications regarding witnesses and confer with M. Robertson regarding same; email to Gruel regarding same (.9); communications with Korn/Ferry witnesses regarding scheduling and confer with M. Robertson regarding same (.2) | 7.90 | $6,007.95 | 8 |
| 04/15/13 | Robertson, M | Prepare for prep sessions with Bob Damon and Joe Griesidieck; address issues related to Nosal's failure to comply with permanent injunction; review/respond to emails regarding criminal trial (1.4); Review/analyze additional documents for possible production in response to government's subpoena (.2); Conference with David Lowe regarding criminal trial (.5); conference with Spencer Fleischer and Neil Townsend regarding criminal trial (.3); Conference with J. Kuai regarding criminal trial (.1); Address issues related to representation of individuals in criminal trial (.3); Review/analyze documents for use with prep for Bob Damon and Joe Griesidieck (.4); Conference with Joe Griesidieck regarding criminal trial (.3); Review/analyze emails that might be relevant to G. Burnison (.9); Conference with P. Dunn and M. Briski regarding criminal trial (.2); Conference with S. Bunzel regarding criminal trial (.2) | 4.80 | $3,499.20 | 7;4;7;7;6; 7;7;7;7;6;8 |
| 04/16/13 | Robertson, M | Conferences with d. Cook and A. Crain regarding issues raised in criminal trial (.5); Review/analyze documents and review/respond to emails regarding issues raised in criminal trial (1.1); Review/respond to emails regarding criminal trial | 2.30 | $1,676.70 | 8;8;8;1;8 |

| | | (.2); Conference with K. Waldinger regarding criminal trial (.1); Conferences with S. Bunzel and P. Dunn regarding criminal trial (.4) | | | |
|---|---|---|---|---|---|

### 3. Advocacy Designed to Protect KFI's Corporate and Civil Litigation Interests

OMM was diligent in protecting KFI's interests throughout the nine years of activity here involved. This activity included numerous internal conferences and communications, keeping executives and team attorneys abreast of developments in the criminal case; protecting the KFI internal investigation from disclosure to Nosal; preventing Nosal from obtaining extensive access to information and documents of KFI by opposing his 17(c) subpoena; limiting its cooperation with the government to areas of its choosing; objecting to Nosal's document requests; drafting numerous briefs and memos in support of KFI's position regarding Nosal; and interacting with the KFI executives and employees.

Just a few examples are the following entries:

| Date | Name | Description | Hours | Amount | Category |
|---|---|---|---|---|---|
| 12/04/09 | Robertson, M | Review/analyze research memorandum regarding privilege issues related to US attorney's office subpoena (.3); Conference with C. Sadlowski regarding response to subpoena (.2); Review/analyze protective order in arbitration and draft correspondence to S. Gruel regarding US attorney's office subpoena pursuant to notification requirements in protective order (.3); Conference with David Cook regarding documents requested in US attorney's office subpoena (.5); Review/analyze documents in preparation for meetings with US attorney's office and conference with US attorney's office regarding same (1); Prepare for meeting with US attorney's office (.7) | 3.00 | $1,876.50 | 4;4;4;4;3;3 |
| 01/10/10 | Evans, J | Draft written objections and responses to trial subpoena requests from government and conduct related review of documents for production (3.4); Continue to draft written objections and responses to trial subpoena requests from government, conduct related review of documents for production (3.2) | 6.60 | $3,682.80 | 4 |
| 01/12/10 | Robertson, M | Conference with J. Kohn regarding response to government's subpoena (.2); Revise objections and response to government's subpoena (.5); Review/analyze documents being produced to government (1.1); Revise letter to K. Waldinger (.2); Review/analyze filings in the criminal matter (1) | 3.0 | $1,876.50 | 4;4;4;4;6 |
| 01/15/10 | Evans, J | Communicate in firm regarding requirements to file under seal in Northern District of California (.6); Prepare letter to Gruel objecting to Rule 17(c) subpoena for submission (.4); Review San Mateo pleadings and prepare for production to government (.5); Review and revise opposition to Nosal's | 6.00 | $3,348.00 | 5;5;4;5;5 |

| | | | | | |
|---|---|---|---|---|---|
| | | motion for Rule 17(c) subpoena and communicate with M. Robertson and A. Dilello regarding same (2.5); Review and revise opposition declaration in support of Nosal's motion for Rule 17(c) subpoena and communicate with M. Robertson and A. Dilello regarding same (2) | | | |
| 01/28/13 | Evans, J | Draft and revise opposition to motion f or Rule 17 subpoena and supporting documents and communicate in firm regarding same | 2.10 | $1,389.15 | 5 |
| 01/29/13 | Smith , M | Research regarding magistrate judge cousins' local rules concerning discovery disputes (.4); Drat and revise Robertson declaration in support of opposition to renewed motion to compel (3.3); Confer with J. Evans regarding Robertson declaration in support of opposition to renew motion for Rule 17(c) subpoena (.3); Review and revise opposition to D. Nosal's renewed motion for an order granting issuance of a Rule 17(c) subpoena (2.4) | 6.40 | $2,851.20 | 5 |
| 03/20/13 | Robertson, M | Draft reply brief in support of motion to quash and review/analyze case law in conjunction with same (1.9); Conference with C. Nahas regarding criminal trial (.1); Conference with D. Carey regarding criminal trial (.2); Address issues related to representation of individual KF employees including emails and calls with individual employees (.5); Review/analyze documents for possible prep of P. Dunn (2.1); Review reply brief in support of motion to quash and review/analyze case law in conjunction with same (2.6); Conference with R. Rutledge regarding reply brief in support of motion to quash (.2) | 7.60 | $5,540.40 | 5;3;3;3;3; 5;5 |
| 04/16/13 | Bunzel, S | Analyze confidentiality issues regarding arbitration papers (.2); attend trial proceedings and confer with K. Waldinger regarding status, communications with M. Robertson and Korn/Ferry employees regarding testimony issues, negotiate with S. Gruel regarding same (8.9) | 9.10 | $6,920.55 | 8 |
| 04/22/13 | Bunzel, S | Review press coverage regarding trial and confer with K. Waldinger and M. Robertson regarding status (.8); confer with client regarding same (.2); communication with S. Gruel regarding Aggarwal and confer with M. Robertson regarding same (.2) | 1.20 | $912.60 | 8 |

Again, all of these are appropriate, even laudable, corporate activities, but we would add that they are discretionary and in our experience are unusual in the scope and amount of effort applied by a private party victim in a criminal matter prosecuted by the government.

### 4. Advocacy During Trial and Sentencing/Restitution Phase

It appears that extensive activities were undertaken by OMM on behalf of KFI in researching legal standards for restitution a pursuing a finding by the Court affirming a high amount of loss as a result of the criminal conduct. The great bulk of this activity appears to be voluntary, discretionary, and not "necessary" as part of the victim's participation in the criminal proceedings.

See, for example the following billing entrie:

| Date | Name | Description | Hours | Amount | Category |
|------|------|-------------|-------|--------|----------|
| 04/03/13 | Smith, M | Draft and revise motion to assert Korn/Ferry's right to attend trial in entirety (4.6); Confer with practice support regarding FTP site for Nosal document production (.2); Research regarding crime victims' rights act and victim's attorneys (.9); Research regarding MVRA and restitution to corporations (.3); Review precedent for Rule 60 motion asserting crime victims' rights (.4)' Review Charlson and Hanson electronic documents for production to Nosal (2.4); Prepare for production of documents for Nosal (.6); Review order regarding production of documents for in camera review (.2) | 9.60 | $4,276.80 | 8;5;9;9;9; 5;5;5 |
| 04/24/13 | Smith, M | Research regarding mandatory victims' restitution act and 9th circuit law | 2.10 | $935.55 | 9 |
| 04/25/13 | Robertson, M | Review/analyze mandatory victims restitution act research | 0.30 | $218.70 | 9 |
| 04/25/13 | Smith, M | Review case law regarding restitution and trade secret theft (.7); Research regarding ninth circuit application of restitution law (1.9) | 2.60 | $1,158.30 | 9 |
| 05/01/13 | Smith, M | Confer with M. Robertson regarding restitution research (.2); confer with court services regarding motion under MVRA (.3) | 0.50 | $222.75 | 9 |
| 05/03/13 | Smith, M | Research regarding restitution awards in ninth circuit (1.7); Draft email memorandum regarding restitution awards in ninth circuit (2.1) | 3.90 | $1,692.50 | 9 |
| 05/08/13 | Robertson, M | Review/analyze MVRA case law | 0.40 | $291.60 | 9 |
| 05/08/13 | Smith, M | Research regarding recovery of investigation costs and attorney's fees in related civil actions (2.8); Review and revise memorandum regarding restitution under MVRA (3.5); Prepare binders of memorandum and cases (.5) | 6.80 | $3,029.40 | 9 |
| 05/09/13 | Robertson, M | Review/analyze case law and research regarding mandatory victims restitution act in ninth circuit | 1.20 | $874.80 | 9 |
| 05/14/13 | Robertson, M | Conference with P. Reilly regarding criminal trial | 0.20 | $145.80 | 6 |
| 05/15/13 | Robertson, M | Conference with P. Dunn regarding restitution issues related to criminal trial | 0.20 | $145.80 | 9 |
| 05/17/13 | Robertson, M | Conference with S. Goodman regarding issues regarding restitution in criminal matter | 0.20 | $145.80 | 9 |
| 05/28/13 | Robertson, M | Conference with K. Waldinger regarding issues related to restitution | 0.70 | $510.30 | 9 |
| 05/30/13 | Robertson, M | Conference with P. Dunn regarding claim of restitution in Nosal matter (.1); Conference with Samantha Goodman regarding issues related to restitution in the criminal matter (.2) | 0.30 | $218.70 | 9 |
| 06/03/13 | Robertson, M | Review/analyze additional research regarding MVRA and review/analyze bills in conjunction with preparing request for restitution (.6); Review/analyze bills in conjunction with preparing request for restitution (2) | 2.60 | $1,895.40 | 9 |
| 06/04/13 | Robertson, M | Review/analyze bbilling records from 2005 to 2013 in conjunction with seeking restitution for same; conference with Brett Pavony regarding preparation of spreadsheets summarizing same | 4.50 | $3,280.50 | 9 |
| 06/04/13 | Pavony, B (paralegal) | Meet with M. Robertson to discuss specifics of upcoming project | 0.40 | $73.80 | 9 |
| 06/05/13 | Robertson, M | Review/analyze case law addressing MVRA in conjunction with seeking restitution for KF's attorney's fees | 0.40 | $291.60 | 9 |
| 06/05/13 | Pavony, B (paralegal) | Create spreadsheet and begin data entry of 2005 bills per request of M. Robertson | 2.30 | $424.35 | 9 |
| 06/06/13 | Robertson, M | Conference with M. Smith regarding further research regarding MVRA (.2); Review/analyze additional research regarding MVRA and submission to restitution under same; review/revise spreadsheet regarding attorneys' fees (.8); Conference with K. Waldinger regarding submission for | 1.80 | $1,312.20 | 9 |

| | | restitution (.4); Review/analyze spreadsheets regarding attorneys' fees and conference with Brett Pavony regarding same (.4) | | | |
|---|---|---|---|---|---|
| 06/06/13 | Pavony, B (paralegal) | Finish preliminary project for M. Robertson and request feedback; discuss future handling of project with M. Robertson and C. Greenfield; inquire about alternative ways of producing documents and document services | 0.90 | $166.05 | 9 |
| 06/07/13 | Pavony, B (paralegal) | Discuss redacting project with M. Robertson; coordinate pdf and searchable pdf production and begin redaction project | 1.20 | $221.40 | 9 |
| 06/10/13 | Smith, M | Research regarding complete accounting standard for victim's restitution | 3.50 | $1,559.25 | 9 |
| 06/10/13 | Pavony, B (paralegal) | Discuss redacting project with attorney; give direction to document services; prepare for attorney feedback | 0.60 | $110.70 | 9 |
| 06/11/13 | Smith, M | Draft memorandum regarding restitution of attorneys' fees | 1.10 | $490.05 | 9 |

In our experience, the U.S. Attorney's office, in conjunction with the FBI, is quite skilled at advocating for determination of amounts of loss and restitution. Accordingly, in our opinion, any advocacy by the lawyers for KFI, while KFI may feel that to be helpful, is not necessary and therefore compensable under the MVRA.

### E. Summary of Non-Compensable Tasks

As we review these billings, using our experience as a prosecutor and litigator to assist in interpretation, we infer and conclude that the vast majority of these activities reflected are not necessary or required aspects of KFI's victimization by Nosal.

Beginning in 2005, KFI appears to have begun a campaign to achieve Nosal's indictment. What follows was a protracted give and take in which government investigators and prosecutors "raised issues" with KFI's proposed course, and KFI responded.

In the pre-indictment process, when KFI was encouraging the U.S. Attorney to indict Nosal, in the post-indictment stage, when KFI was supporting a useful conviction, and in the present post-conviction stage, where it seeks restitution, OMM, quite properly, was and is acting primarily to protect KFI's interests, not those of the United States.

OMM lawyers were lobbying the government, pushing KFI's agenda, objecting to document requests by government and Nosal alike, protecting its internal investigation, coordinating with the civil litigation, preparing its witnesses, fighting to get permission for lawyers to attend trial, researching restitution, and related activities. Vague description of

24

activities suggest that what exactly is being done and said is, for KFI's purposes, to be kept confidential.

We therefore can only estimate, and opine that 80%-90% of these activities are neither necessary nor reasonable participation as a victim as opposed to an advocate. Our total compensable hour analysis is consistent with this estimate.

### F. Arguably Compensable Tasks

#### 1. Document Review Necessary for Compliance with Subpoena

Under the assumption that reasonable and necessary attorneys efforts in KFI's "participation" in the criminal prosecution are compensable, we will here try to analyze and quantify these amounts. Obviously, the government or Defendant may subpoena documents from KFI. While KFI employees would be able to produce a universe of potentially responsive documents, it could be a reasonable task in a complex case for an attorney or paralegal to review documents to identify those responsive to the categories of items sought.

We hasten to add that advocacy activities objecting to or resisting production would appear to go beyond the foreseeably normal, necessary and reasonable role of a victim.

Skilled and experienced prosecutors like Mr. Waldinger, and agents of the FBI, reputedly the world's finest investigative agency, would seem more than capable of gathering documents from KFI and responding to requests from Defendant. Whether Defendant obtains documents that are in KFI's opinion unnecessary for Nosal's criminal defense or are particularly troublesome in the criminal prosecution of Nosal or in the companion civil litigation, are not appropriate concerns of KFI in the criminal matter. Rather, it is the government prosecutor's job to make judgments regarding these matters in the criminal case, and certainly within OMM's non-compensable area of responsibility in the civil litigation. Indeed, KFI has a legitimate interest in prosecuting the companion civil litigation, but that should not be compensated for that work, we opine, in the criminal context as part of restitution to a victim. Any award of attorneys fees for such would appear to be simply an exception to the American Rule in which each party is to bear its own costs in litigation. The capable U.S. Attorney's office is responsible for the

25

criminal prosecution, and any efforts of KFI's excellent attorneys at OMM in the criminal matter are generally gratuitous and discretionary.

We have attempted to cull from the billing entries those <u>document review activities that have been connected directly to formal or informal compliance with subpoena or request for documents</u> by the government or Defendant.  In so doing, we note, as per the above, that we likely "over-included" in this grouping document review designed primarily to protect the civil interest interests of KFI or thwart Nosal in his criminal defense which efforts should not be compensated.  We as well concede that there are likely document search activities we have not identified which truly relate to a government request.  By over-including document review that may be more related to KFI corporate purposes, we believe we have more than generously accounted for instances where we have not identified purely responsive activities.

We have identified approximately 269 total hours of document review and document production activities.  These activities conducted prior to 2012 were subject to a 70% reduction for non-criminal activity nexus, and for advocacy activities, explained above.  Thus, the approximately 218.3 hours of pre-2012 review and production activities have been reduced to 65.5 compensable hours.  The result is a net total of approximately 106 compensable hours (includes 40.5 net hours total from 2012 forward, reduced for inefficiency from 50.7) for these activities, which also reflects further appropriate reductions for excessive inefficiency and over-staffing.  See attached **Exhibits A, B, C, and D**.  Exhibits A and C reflect hours expended on document review and production, pre-2012 and post-2012, respectively.  Exhibits B and D reflect the time spent on reviewing documents to comply with subpoena or document requests from the government, pre-2012 and post-2012, respectively.

As we will detail hereafter, we believe that the multi-lawyer staffing, while quite appropriate for complex civil litigation, was inappropriate for the limited participation of a criminal victim, and subject therefore to excessive inefficiency.  We use the term, "excessive inefficiency" which, while seemingly redundant, reflects the notion that some inefficiency is to be expected in any provision of legal services.  This amount of inefficiency we estimate at 20%

26

of the time spent by OMM on any particular post-2011 activity, and will use the 20% figure for calculation in this Report.

Accordingly, we have calculated the gross compensable document review and production time to be a net number of 106 hours compensable for document review and production. These hours include the net 65.5 for pre-2012 time, and 40.5 thereafter, the latter number coming from 50.7 hours reduced by a 20% inefficiency factor.

While this time allocation is small compared to the total number of hours expended by OMM as reflected in the billings submitted, it is, by any objective analysis a generous amount of legal time to allot to document review and production in a case involving three instances of illegal downloading of prospect lists. We repeat that this time may over-include for non-compensable activity.

### 2. Interacting with Prosecutors and KFI Witnesses

Besides document review (directed toward compliance), the prosecution would likely wish KFI to have available a representative to provide basic information about witness identification, the structure of the organization, and the nature and classification of available KFI documents. For both the Grand Jury proceedings and for trial, it would also be convenient for the prosecution to have a "point person" with whom it could coordinate requests for witness appearances and schedule same.

Again, whether this is compensable as necessary "participation" in criminal proceedings, or merely courtesy and convenience to the prosecution afforded by a corporation interested in and encouraging conviction, is a question for the Court to determine. We can only opine here that this activity is not clearly non-compensable. And per our prior analysis, this work does not require a highly skilled and experienced lawyer to perform.

We are unable to glean from the billing records how much time was spent on these activities because of both the lack of specificity of the billing records, and of the intermixture of other clearly non-compensable activities with the arguably compensable items.

27

One response to this vagueness and co-mingling would be to opine that, because of the vague nature of the billing records, none of this time can be verified, and therefore none can be compensable. We opine that this is the better view of compensability as to this element of potential restitution.

However, it is obvious that intermixed in the various activities of OMM are these coordinating activities. If we were required to estimate what would be a reasonable amount of time for such activities, we would opinion that approximately 50 hours should be more than sufficient if carried out with reasonable efficiency.

Certainly, if criminal prosecutions were run with industrial efficiency, these tasks should in the aggregate take no more than 25 hours. It should ideally, for instance, take no more than ten hours for counsel to provide the FBI with a basic overview of the KFI view of the case and provide witness contact information; ten more to coordinate witness meetings; several more hours to schedule Grand Jury witness appearances; and a similar amount of time for such trial scheduling. But, having said that, experience tells us that these matters are never executed with Spock-like efficiency, and therefore we estimate that 50 hours should be more than sufficient, taking into account the normal fits and starts of criminal prosecutions, etc. We do not include in this estimate any time for brief writing or advocacy activities, but do include time for OMM to inform the prosecution of KFI's objections to the production of various categories of documents.

### 3. Preparation of Loss and Restitution Factual Declarations

KFI employees should be able to quantify various elements of loss and damage, and appear to have done so in this case. Putting KFI's contentions into proper Declaration format with proper foundation may or may not be a compensable as truly being necessary.

It would seem that that the excellent prosecution team could interact with the KFI executives to properly provide loss and restitution claims to the Court. Indeed, in most cases where the MVRs apply, we presume that the victim does not have a lawyer at her disposal to prepare such submissions.

If this activity is compensable, it should reasonable require no more than 25 hours of legal time to interview KFI executives and assure that their claims are put forward in appropriate form.

We note that OMM expended considerable time researching and writing memorandum on restitution. We opine that these advocacy activities are not compensable.

### 4. Conferencing Tasks

As we noted above, it is impossible discern the nature and purpose of the communications between OMM and government agencies. Much of them, it appears, related to non-compensable purposes. Even though these vague descriptions argued, under prevalent billing standards against any allowance for such communications, we have tried to give fair estimates of such needed interaction in the preceding sections.

Nevertheless, we have attached a summary of the billing entries dealing with "confer" and "conferencing" activities, and have attempted to quantify those communications between OMM and the government. Highlighted portions of **Exhibit E** reflect our rough categorization of the same.

These entries indicate show approximately 76.7 hours pre-2012 of same, and 32 from the beginning of 2012 on. If we apply our formula of a 70% reduction of pre-2012 OMM activity, and 20% inefficiency reduction from 2012 on, we note that the net hours total 49.

This total compares favorably with our allowance of 75 total hours for coordination and communication activities, the great bulk of which would involve OMM-government consultation and coordination. Therefore, if our 75 hour allowance is not accepted, this total could present an alternative calculation. In any case, we believe the amount of conferencing time noted on this chart validates our 75 hour estimate as being reasonable

### 5. Efficiency Analysis

This case involved three instances of the legal downloading of lists, involving three main KFI witnesses represented by OMM, and four cooperating former KFI employee witnesses, three represented by outside counsel. The trial took eight court days. Two OMM attorneys attended

29

much of the proceedings, but there was no issue presented at trial requiring their argument or appearance before the Court. This was not a complex case. Yet twenty billing personnel have recorded time over nine years for which KFI seeks reimbursement. Among these personnel are attorneys billing at rates over $750 an hour, one billing above $1000, and several others billing at over $500 an hour. As noted previously, the average rate over time for attorney billings exceeds $600 per hour. In our opinion, the staffing of this matter *for purposes of participation in the criminal proceedings* is grossly excessive. If there is a value to the involvement of legal personnel in this criminal proceeding, it would be to streamline and simplify the criminal proceedings both for the prosecution and for the victim. The prosecution would hope to have the victim pinpoint without great irrelevancy the facts underlying the crimes, the identification of the witnesses, and the documents possessed in support of the claims. KFI would want to coordinate its presentation to the prosecution and speak with one voice. But these ends are not promoted by such extremely excessive staffing.

Notwithstanding this, we do opine that the staffing we have observed is reasonably efficient for complex litigation, and if we were called upon to opine as to OMM's efficiency as it might pertain to civil litigation, we would be highly complimentary of the staffing we see here. Even though there are twenty billing personnel on this case, there appears to have been some effort to have much of the work performed by a team of four billing personnel. Mr. Robertson was the focus and hub of legal activity, as remained on the case, and in that regard the efficiency is commendable.

However, staffing civil litigation with four personnel as the core team is often reasonable because of the dictates of fast-paced litigation. Depositions must have preparation; written discovery propounded is expected to involve attendant disputes; motion work can be heavy; and numerous documents Bates-stamped, managed, organized and used.

Accordingly it is quite common for a senior associate or younger partner such as Mr. Robertson, who commenced his work on this case as a lawyer of six years of experience, and currently has fifteen, to perform a great amount of the key work in civil litigation. Younger

lawyers and paralegals would typically be assigned below such an attorney, and often a senior partner will supervise the team on an intermittent basis. Other personnel may be called upon from time to time to perform tasks that do not require a detailed understanding of the case. However, this staffing pattern makes no sense if the main purpose of the activity is necessary participation in criminal proceedings.

As we note, Mr. Robertson was engaged from start to finish on this case and obviously had a good grasp upon its facts. However, document review and document production activities were performed by a wide variety of individuals, each of whom may not have the detailed knowledge of the case that Mr. Robertson had, and each of whom may cover ground already accomplished by another. In other words, to as great a degree as possible, document review should be conducted by a single person.

The inefficiency multiplies, of course, as more members of OMM are assigned document review tasks. Part of the inefficiency that necessarily occurred here was caused by the necessity of personnel each learning the case and the pertinence of documents being reviewed. Another form of inefficiency likely came from communication the results of the document review to other lawyers as we note above, the purposes for which the documents are being reviewed may change from time to time. On one occasion, it may be the case that documents are reviewed for compliance for subpoena, whereas in another case the documents may be reviewed for attorney-client and work product privileges. Because we have already reduced pre-2012 time significantly by 70% for advocacy and lack of criminal conduct nexus, we will not further reduce this pre-2012 time for inefficiency.

In summary, we estimate that 20% of the time from 2012 on involved in document review and other activities constitutes unreasonable inefficiency, bearing in mind that some inefficiency is to be expected in the provision of legal services. In short, this matter was over-staffed as it pertained to participation in criminal proceedings, and the resulting services are 20% inefficient.

Although we here opine that activities such as lobbying and advocacy are non-compensable, we further opine that if they were compensable, they would be subject to a 20% reduction for inefficiency from 2012 on, and a 70% reduction for time prior to 2012.

## V.     CONCLUSION

We here summarize the quantification of what we believe to be compensation for attorneys efforts constituting participation in the criminal proceedings.

OMM has sought payment for approximately 1692 hours of legal services. As noted above, the billing rates here charged are excessive for the services that are arguable needed to participate in legal proceedings. Accordingly, if the entirety of these 1692 hours were compensable at an appropriate billing rate of $250 an hour, which we would apply for simplicity as a flat rate to all legal and paralegal personnel, the compensable amount would be approximately $425,000. However, because much of the services prior to 2012 involved activity which was not criminal in nature, the total hours should be reduced to reflect the lack of connection to the crime. Accordingly, we have reduced the pre-2012 hours of 733 by 70%, thus subtracting 513 hours, for a net total of approximately 1200 hours, which at $250 an hour would amount to approximately $300,000.

However, the great majority of this work appears to be non-compensable activities for which restitution would not appear to be factually demonstrated. Of the remaining 1200 hours billed, we conclude that a net of 106 are related to compensable document review and production, as adjusted from gross arguably compensable time. Additionally, because of the lack of clarity in the billings, we have estimated that no more than 75 total additional hours should have been expended upon scheduling, coordination and interaction with the government and witnesses, and preparation of factual declarations and communication with the government regarding loss and restitution.

Therefore, in our opinion, compensable hours total 181 at $250 per hour for a total compensable restitution of $45,250.

Here approximately 80% of all activity is non-compensable, voluntary, gratuitous and/or advocacy-based. In addition, approximately 70% of all pre-2012 time is presumptively related to non-criminal activity. Accordingly, in our opinion 181 hours is a reasonable amount of legal time that arguably was necessary for KFI's attorneys' participation in this criminal proceeding, and likely over-compensates KFI for OMM billings.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 21st day of April 2014 in San Francisco, California.

JOHN D. O'CONNOR