1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  KYLE F. WALDINGER (ILBN 6238304)
   MATTHEW A. PARRELLA (NYBN 2040855)
5  Assistant United States Attorneys

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
7        Telephone: (415) 436-7200
         Fax: (415) 436-7234
8        E-Mail:      kyle.waldinger@usdoj.gov
                      matthew.parrella@usdoj.gov
9
   JENNY C. ELLICKSON (DCBN 489905)
10 Trial Attorney

11       U.S. Department of Justice
         Criminal Division
12       Appellate Section
         950 Pennsylvania Avenue, N.W., Suite 1264
13       Washington, DC 20530
         Telephone: (202) 305-1674
14       Fax: (202) 305-2121
15       E-Mail:      jenny.ellickson@usdoj.gov

16 Attorneys for United States of America

17                    UNITED STATES DISTRICT COURT

18                  NORTHERN DISTRICT OF CALIFORNIA

19                      SAN FRANCISCO DIVISION

20 UNITED STATES OF AMERICA,         )  No. CR 08-0237 EMC
                                     )
21         Plaintiff,                )  **UNITED STATES' MEMORANDUM**
                                     )  **REGARDING RESTITUTION**
22    v.                             )
                                     )
23 DAVID NOSAL,                      )
                                     )
24         Defendant.                )
                                     )
25 _____ )

26

27

28

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................................1

II.     PROCEDURAL BACKGROUND REGARDING RESTITUTION
        DETERMINATION ...........................................................................................................2

III.    ARGUMENT .....................................................................................................................4

        A.      Korn/Ferry's Response Costs. ...............................................................................5

        B.      Korn/Ferry Employee Participation in the Investigation and Prosecution. ........6

        C.      Korn/Ferry's Legal Fees. .......................................................................................8

        D.      Recent Case Law.................................................................................................14

III.    CONCLUSION................................................................................................................16

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Hensley v. Eckerhardt*,
  461 U.S. 424 (1983) ........................................................................................... 11

*Inland Mediation Bd. v. City of Pomona*,
  158 F. Supp.2d 1120 (E.D. Cal. 2001) .................................................................... 5

*Paroline v. United States*,
  2014 WL 1612426 (S. Ct. Apr. 23, 2014) ........................................................ 15, 16

*United States v. Amato*,
  540 F.3d 153 (2d Cir. 2008) ................................................................................. 12

*United States v. Bahel*,
  662 F.3d 610 (2d Cir. 2011) ................................................................................. 12

*United States v. Barany*,
  884 F.2d 1255 (9th Cir. 1989) .............................................................................. 13

*United States v. Boccagna*,
  450 F.3d 107 (2d Cir. 2006) ................................................................................. 15

*United States v. Bussell*,
  504 F.3d 956 (9th Cir. 2007) ................................................................................ 14

*United States v. Cummings*,
  281 F.3d 1046 .................................................................................................... 13

*United States v. DeGeorge*,
  380 F.3d 1203 (9th Cir. 2004) ......................................................................... 12, 13

*United States v. De La Fuente,*
  353 F.3d 766 (9th Cir. 2003) .................................................................................. 7

*United States v. Dubose*,
  146 F.3d 1141 (9th Cir. 1998) .............................................................................. 14

*United States v. Gordon*,
  393 F.3d 1044 (9th Cir. 2004) ..................................................................... 1, 2, 4, 7

*United States v. Lazarenko*,
  624 F.3d 1247 (9th Cir. 2010) ................................................................................ 8

*United States v. Papagno*,
  639 F.3d 1093 (D.C. Cir. 2011) .......................................................................... 5, 6

*United States v. Yeung*,
  672 F.3d 594 (9th Cir. 2012) ............................................................................ 8, 14

1

**<u>STATUTES</u>**

2   18 U.S.C. § 2259 ................................................................................................... 15

3   18 U.S.C. § 3663A(b)(4) .................................................................................... 6, 7, 8

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. INTRODUCTION

Pursuant to the briefing schedule set by the Court on March 24, 2014, the United States submits this Memorandum regarding the proper amount of restitution to award to the victim Korn/Ferry International ("Korn/Ferry"). As set forth in more detail herein, the United States requests that the Court enter a restitution order in the amount of $1,240,024.65.

This amount is comprised of (1) $27,400 for response costs; (2) $247,695 for the value of Korn/Ferry employee time spent responding to government requests for information, meeting with investigators, and attending the trial; and (3) $964,929.65 in attorneys' fees paid by Korn/Ferry to the law firm O'Melveny & Myers ("OMM"). Each of these three categories of expenses has already been subject to extensive briefing. This filing consists of (1) the reiteration of previous arguments made by the United States; (2) responses to additional arguments that the defendant Nosal is expected to make in his April 28, 2014 filing; and (3) the incorporation of extensive work done by Korn/Ferry and OMM to categorize and organize the work performed by OMM attorneys. This categorization is set forth in two Excel spreadsheets that the government will submit to the Court in an under seal filing. The United States will also provide courtesy electronic copies of these spreadsheets to the Court.

*   *   *

The Court will quickly discern that the parties have not submitted a joint filing. As it turns out, there is very little agreement between the parties as to whether Korn/Ferry is entitled to restitution for many of the categories of expenses that were set forth in the memoranda filed by the government on November 12, 2013 and January 3, 2014 and in the legal fee bills submitted by Korn/Ferry. Indeed, the parties are not in agreement with respect to any particular "line item" of restitution being claimed by Korn/Ferry because, at the very least, Nosal disputes both the hourly rate charged by Korn/Ferry's attorneys and the value of the Korn/Ferry employees' time.

The United States acknowledges that this has turned out to be a long delay in the resolution of this case. In truth, the parties are as diametrically opposed today as they were two-and-a-half months ago. At bottom, the issue before the Court is how to achieve the MVRA's "primary and overarching goal of . . . [making] victims of crime whole." *United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004). The United States and the defendant have provided a mountain of briefing to the Court regarding

this issue. After months of back-and-forth, there are very few areas of agreement between the parties. Accordingly, the United States suggests that in deciding this issue the Court's first action should be to read the declarations of the Korn/Ferry employees and of Korn/Ferry's counsel that have been submitted to the Court, to review the sortable spreadsheets prepared by OMM, and to review Ms. Briski's statement to the Court on behalf of Korn/Ferry at the October 9, 2013 hearing (*see* Ex. 1, at 5-7). The declarations that have been filed are the following:

- Declaration of Mark Robertson, Doc. 463, Ex. 2 thereto;
- Declaration of Peter Dunn, Doc. 477;
- Declaration of Caroline Nahas, Doc. 478;
- Declaration of Marlene Briski, Doc. 479;
- Supplement Declaration of Mark Robertson, filed under seal on 11/14/2013; and
- Second Supplemental Declaration of Mark Robertson, Doc. 496.

In addition, the Court will recall the trial testimony of Ms. Nahas, Mr. Dunn, and Ms. Briski. The latter two witnesses described Korn/Ferry's actions when it discovered that current and former employees might be involved in stealing information from the company. And, as noted above, Ms. Briski advised the Court of the significant impact that the defendant's crimes have had on the company. Ex. 1, at 5-7.

The United States submits that Korn/Ferry's actions since its discovery of Nosal's crimes are typical of those that would be taken by any company faced with a similar theft of its "core assets."[1] Simply put, the amount of restitution sought by Korn/Ferry is related to reasonable and necessary actions taken by and on behalf of the company as part of this criminal investigation and prosecution. The Court therefore should award restitution in the claimed amounts.

## II. PROCEDURAL BACKGROUND REGARDING RESTITUTION DETERMINATION

On October 2, 2013, the United States submitted its Sentencing Memorandum in this case. Doc. 461. The United States sought a restitution order of $939,406.25, based only on the legal fees that

---

[1] *See, e.g.*, RT 505:24-505:7 (Dunn testimony that "what we saw evidence of was employees who had been making sort of a common use of the database for their daily activities up until days before their departures, where they downloaded thousands, tens of thousands of records into customized reports, erased their tracks, and – and exfiltrated the information from the company. We had not experienced any intrusion or attack on our core assets in the history of the company.").

Korn/Ferry had paid to OMM.  Doc. 461, at 9.  The United States did not support Korn/Ferry's request for restitution in the amount of $278,700 for the value of the information misappropriated in the counts of conviction, or, in the alternative, in the amount of $175,000 related to the UTStarcom CFO placement.  *Id.* at 10:7-15.  At that time, Korn/Ferry had not provided "a breakdown of the value of time expended by its employees responding to computer intrusions and thefts."  *Id.* at 5:3-4.  The United States later submitted a Sentencing Reply that included a detailed declaration from OMM attorney Mark Robertson.  Doc. 463, Ex. 2 thereto.

At the first sentencing hearing on October 9, 2014, the Court allowed the government to obtain additional information from Korn/Ferry regarding Guidelines loss amount and restitution and to submit additional briefing.  Doc. 467.  Accordingly, on November 12, 2013, the United States filed its Supplemental Sentencing Memorandum Re Loss and Restitution.  Doc. 476.  Along with that filing, the United States submitted declarations from the Korn/Ferry employees who had testified at trial and/or participated in the investigation of the offenses: Peter Dunn, Caroline Nahas, and Marlene Briski.  Docs. 477, 478 & 479.  The United States also submitted the under-seal declarations of Marat Fookson and OMM attorney Mark Robertson.  Based on these declarations and the work performed by Korn/Ferry in preparing them, the United States requested restitution be paid to Korn/Ferry for three categories of expenses: (1) response costs; (2) the value of employee time spent responding to government requests for information, meeting with investigators, and attending the trial; and (3) the attorneys' fees related to the criminal matter that Korn/Ferry had paid to OMM.  Doc. 476, at 18:11-27.

On December 16, 2013, the defendant filed his memorandum responding to the United States' position on restitution.  Doc. 490.  On January 3, 2014, the United States filed its Reply Regarding Restitution.  Doc. 495.  The United States also filed another declaration by Mr. Robertson.  Doc. 496.  The defendant filed a supplemental reply regarding loss and restitution on January 6, 2014.  Doc. 499.

On January 8, 2014, the parties appeared before the Court for sentencing.  On that day, the Court sentenced the defendant to 12 months and one day in prison, three years of supervised release, and a fine of $60,000.  The Court also ordered the defendant to perform 400 hours of community service during the term of his supervised release.  Docs. 502 & 509.  At the time of sentencing, the Court scheduled a hearing for February 12, 2014, for a hearing on the government's motion for restitution.

The parties appeared as scheduled before the Court on February 12, 2014. The Court preliminarily indicated that Korn/Ferry was entitled to restitution in this matter. *See* Ex. 2, at 5:10-17 ("[M]y view is restitution does lie. It does lie for internally incurred costs if they were incurred in connection with the participation in investigation or prosecution. The *Gordon* case also establishes that attorney's fees, outside attorney's fees, can also be included within that ambit. And then it becomes a factual question: What's reasonable? What's proximately related?"). Counsel for the government indicated that that he believed that the parties were "not going to agree on an amount" of restitution. The government suggested that the Court simply rule on broad categories of expenses that it found to be recoverable and have Korn/Ferry re-submit a claim that included expenses within those categories. *Id.* at 6:21-7:9. However, defense counsel acknowledged that "the Court has laid out broad areas that are no longer in dispute and . . . it will be clear that there are some battles which are no longer to be fought" and then indicated "that we might then be able to come back with . . . a fairly significant number of items" upon which the parties agree. *Id.* at 7:14-19. Based on this invitation from defense counsel, the Court directed the parties to meet and confer and to submit further briefing regarding any disputes by March 26, 2014. *See* Doc. 523. At the parties' request, the Court later amended the briefing schedule to allow the parties to filing their memoranda on April 28, 2014. Doc. 530.

The government provided the defense with materials from OMM on March 12, 2014. On April 15, 2014, defense counsel informed the government of the defendant's position on restitution amount. Given the disparity in the parties' position, no joint filing was possible. Defense counsel shared draft briefs with the government on April 15 and April 27, and provided the declaration of John D. O'Connor on April 22. Because of AUSA Waldinger's other obligations, he was not able to complete a draft of this brief that was in a form that could be shared with defense counsel before April 28.

### III. ARGUMENT

This Court has already had the benefit of extensive briefing regarding the issue of restitution. Now, in addition to this brief, Nosal will file his own brief and a declaration of John D. O'Connor. Moreover, the government will be providing the Court with two Excel spreadsheets prepared by OMM.

The first is a 42-page Excel spreadsheet that sets out each OMM billing entry. Each entry is coded with one or more codes corresponding to a set of nine categories of legal work. The columns in

this spreadsheet are sortable by attorney, date, amount, and code. For these reasons, the United States will provide the Court with a copy of the spreadsheet in electronic form so that the Court can manipulate it in its native format if it desires. This spreadsheet has a second "tab" entitled "Sub-Total by Category" that summarizes the amount of legal fees expended on each of the nine categories.

The second spreadsheet consists of OMM billing entries for which Korn/Ferry *is not* seeking restitution. These entries were given Code 0. This second spreadsheet includes fees for which Korn/Ferry previously sought restitution, but for which it is no longer seeking restitution (such as fees incurred during the pendency of the interlocutory appeal in this matter).

**A.     Korn/Ferry's Response Costs.**

At the sentencing hearing on January 8, 2014, and in a later Order memorializing its findings, this Court found that Korn/Ferry had incurred response costs of $27,400. Doc. 503. Although the United States took the position that Korn/Ferry's response costs were higher, at a minimum, this $27,400 amount should be awarded in restitution.

The defendant may argue that such response costs are not recoverable under the MVRA, citing *United States v. Papagno*, 639 F.3d 1093, 1098 (D.C. Cir. 2011). *See* Doc. 490, at 7:22-8:2. The United States addressed this argument in its January 3, 2014 brief. *See* Doc. 495, at 6:8-8:1. In light of controlling Ninth Circuit case law, this Court should flatly reject defendant's continued reliance on out-of-step and out-of-circuit authority. *See Inland Mediation Bd. v. City of Pomona*, 158 F. Supp.2d 1120, 1147 & n.19 (E.D. Cal. 2001) ("Defendants fail to distinguish, or even cite, Ninth Circuit authority regarding this issue. . . . This Court is bound to follow the decisions of the Ninth Circuit. Counsel are expected to cite such authority when it is available.").

One point regarding the D.C. Circuit's decision in *Papagno* is worth making here, however. It is notable that the defendant uses *Papagno* as a shield when it is convenient for him to argue that restitution is not available for certain categories of offenses, but that he just as conveniently ignores *Papagno* when it supports an award of restitution. The defendant has argued that *Papagno* stands for the proposition that Secton 3663A(b)(4) "only covers costs when a victim is actively 'taking part' in a prosecution." Doc. 490, at 5-6. In addition, he has argued on numerous occasions that Korn/Ferry was extremely involved in the criminal investigation and prosecution. *See, e.g.*, 4/8/2013 Tr., at 18:9-11

(defense opening statement that Korn/Ferry's attorneys were "just using the government to essentially do their dirty work") (attached hereto as Exhibit 3); RT 1645 (defense closing argument that the "power of Korn/Ferry enabled them to get an O'Melveny lawyer with connections with the government, to try to convince the government to bring [] criminal charges against David Nosal . . . . They convinced the government to bring criminal charges against Mr. Nosal."); Doc. 341, at 2:14-15 ("it was KFI that conducted virtually all of the investigation that led to the indictment in this case"). Although the government strongly disputes the defendant's specific allegations of improper behavior on Korn/Ferry's part, given Nosal's repeated cries of "foul" with respect to Korn/Ferry's behavior, it is very incongruous for him to now dispute whether Korn/Ferry was "taking part" in the prosecution at all. Having taken his position in litigation, it is impossible for him to now argue that Korn/Ferry did not, to any great extent, "participat[e] in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4).

**B.    Korn/Ferry Employee Participation in the Investigation and Prosecution.**

The United States submitted declarations from Peter Dunn, Caroline Nahas, and Marlene Briski in conjunction with its November 2013 filing. *See* Docs. 477, 478 & 479. These declarations set forth an estimate of the number of hours spent by these three individuals, as well as by Dan Demeter, in responding to government requests for information, meeting with investigators, and attending trial. The United States also submitted a declaration by Marat Fookson setting forth an estimate of the value of these employees' time (under seal document filed on or about November 14, 2013). Based on these submissions, the value of this employee time is $247,695. (The bases for this figure are set forth in the United States' January 3 memorandum. *See* Doc. 495, at 8:3-12.)

The United States expects that the defendant will continue to dispute the valuation method used by Fookson. The government has already responded to this argument. *See* Doc. 495, at 11:9-13.

The United States also expects that the defendant will challenge the particularity of the declarations filed by Dunn, Nahas, and Briski. The United States addressed these arguments in detail in its January 3 brief. *See* Doc. 495, at 8:2-11:15. However, the United States can seek additional details from Korn/Ferry should the Court require them. [2]

---

[2] In this vein, the government notes that Judge Fogel issued an order in the *Gordon* case in which he identified specific questions that he had regarding Cisco's claim for investigative costs. *See United States v. Gordon*, CR 01-20077 JF, Doc. 155.

1    The United States also expects that the defendant will claim that the value of the Korn/Ferry's

2    employees' time counts as a "consequential damage." However, the MVRA *clearly* states that victims

3    are to receive compensation for "expenses incurred during participation in the investigation or

4    prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C.

5    § 3663A(b)(4). The United States submits that the time expended by Korn/Ferry employees falls within

6    this Section 3663A(b)(4) and was a necessary, direct, and foreseeable result of the offense conduct.

7    The United States has also been informed that the defendant intends to raise a ***new*** argument in

8    his April 28 filing. It appears that the defendant will argue that, should Korn/Ferry receive restitution

9    for the "***wages***" it paid to its employees, such an order will raise questions about the "constitutional

10   regularity" of the government's case. Of course, the government is not requesting that the Court direct

11   payments to any *individual witness*. Moreover, the government expects that the defendant will

12   studiously ***avoid*** using the applicable term – *i.e.*, "value of Korn/Ferry employee time" – and will use the

13   term "wages." However, to be clear, the government is ***not*** asking the Court to give Korn/Ferry the

14   wages that it paid to its employees. Rather, it is asking the Court to reimburse Korn/Ferry for the value

15   of its employees' time that was lost to participation in the investigation and prosecution and to attending

16   court proceedings. The compensation that Korn/Ferry paid those employees is the ***measure*** of the value

17   of that time. The Ninth Circuit clearly held in *United States v. De La Fuente* that restitution payments

18   are appropriate to compensate victims for "lost . . . employee work hours." 353 F.3d 766, 768 (9th Cir.

19   2003); *see also* Doc. 495, at 10:22-11:8 (setting forth argument in detail).

20   In addition, the government notes that the provisions of Section 3663A(b)(4) were known to

21   defense counsel at trial. Indeed, counsel were well aware of the MVRA after having litigated issues

22   regarding the statute in other cases. *See, e.g.*, *United States v. Yeung*, 672 F.3d 594 (9th Cir. 2012)

23   (counsel Boersch); *United States v. Lazarenko*, 624 F.3d 1247 (9th Cir. 2010) (counsel Riordan). Being

24   fully aware of the MVRA, counsel had an equally full opportunity to cross-examine Korn/Ferry's

25   witnesses and to call any Korn/Ferry witnesses it wished to in the defendant's case to explore the issue

26   of bias. Accordingly, to the extent that there is some "payment to a witness" issue, the defendant was on

27   notice at the time of trial of the victim's right to restitution in this regard. The defendant cannot

28   complain now that he was not able to explore the bias of the witnesses on the MVRA issue.

Finally, one point must be made regarding the reasonableness and foreseeability of Korn/Ferry's costs. In deciding how much of Korn/Ferry's investigative costs and costs incurred in participating in the government's investigation and prosecution Nosal should be ordered to repay, this Court should consider that it was Nosal, not Korn/Ferry, who dealt the hand: Nosal, a trusted former high-level executive chose to take advantage of his position, his specialized knowledge, and his connections with JFL, Christian, and Jacobson to obtain numerous source lists and other items from Korn/Ferry's computer system for his own benefit. Korn/Ferry's efforts to trace the full extent of Nosal's perfidy and assist the government in its investigation were reasonably taken in response to Nosal's actions.

## C. Korn/Ferry's Legal Fees.

Korn/Ferry (through OMM) has taken the OMM legal bills that were submitted under seal in November 2013 (as well as additional OMM legal bills from October 2013 through January 2014) and has entered each line item into an Excel spreadsheet which lists the (1) date of the legal work; (2) the attorney who performed the work; (3) a description of the work performed; (4) the amount of time expended; (5) the resulting amount billed for that entry; and (6) a code corresponding to one of nine categories. In many instances, the column setting forth the code contains multiple codes, due to the fact that the attorney's work on that date fell within more than one category. A list of these codes is attached hereto as Exhibit 4.

By reviewing and sorting the spreadsheet, the Court can clearly see the significant work done by OMM attorneys in (1) responding to several sets of subpoenas from the government; (2) responding to Rule 17(c) subpoenas issued by Nosal; (3) representing Korn/Ferry with respect to a grand jury appearance by its employee; (4) meeting with Korn/Ferry employees with respect to interviews with government investigators and trial preparation; and (5) responding to numerous requests from the U.S. Attorney's Office and the FBI for information, among other specific tasks.

That Korn/Ferry's attorneys expended significant efforts in gathering documents and information in response to both formal and informal requests from the government and the defense is both laudatory and to be expected of competent counsel. In addition, as this Court is aware, this case was originally assigned to the Honorable Marilyn Hall Patel. After Nosal was indicted, Judge Patel announced in another case that "heads will have to roll" when a company that had received a subpoena for documents

during the course of the government's grand jury investigation turned over "highly relevant e-mails" to the government only the day before the criminal trial was to begin. *See* Ex. 5 (articles re *United States v. Kent Roberts*). In light of counsel's obligation to fully respond to subpoenas and the presiding judge's comments in another case in which that obligation was not fulfilled, Korn/Ferry's attorneys properly expended significant efforts to make sure that they had complied with relevant legal process.

The government notes that, since the parties' last appearance, Korn/Ferry has deleted from its request the fees that Nosal had objected to regarding OMM's bills for legal work performed during the pendency of the appeal in this matter. Specifically, Korn/Ferry has not included any of OMM's bills after February 2010 and before April 2012. All of the OMM legal fees related to the criminal case that were included in the November 2013 under seal submission but for which Korn/Ferry is now not seeking restitution are set forth in a separate "Code 0" spreadsheet that will be submitted to the Court.

The United States expects that the defendant will make a host of objections to the legal fees claimed by Korn/Ferry, and that he will submit a declaration from an attorney, John D. O'Connor, who he submits as an "expert" in legal fee disputes. The United States sets out below its observations on the defendant's likely arguments and expert.

- John D. O'Connor

The defendant has retained an attorney, John D. O'Connor, to opine regarding the reasonableness of OMM's attorneys' fees. The United States will address Mr. O'Connor's major points below, but makes the following observations at the outset.

As Mr. O'Connor readily admits, he has very little experience in criminal defense work and does not claim to have any experience or knowledge regarding victims' participation in the investigation and prosecution of defendants. O'Connor Decl., at 5. He appears to have previously represented neither a victim that has been asked to provide information to the government as part of a criminal investigation, nor a defendant in a case in which restitution was ordered to be paid to a victim. Although he has been retained on many occasions to opine on the reasonableness of "litigation fees," and appears familiar with the various fee-shifting statutes, the declaration provided to the United States cites no MVRA or VWPA case law. Mr. O'Connor can hardly be said to be an expert in the reasonableness of fees under the MVRA if he does not demonstrate an understanding of the case law interpreting that statute. Indeed, at

this point, the relevant expert regarding the MVRA is this District is this Court.

That being said, it must be noted that the defendant's own expert has opined that it is reasonably foreseeable that a corporate victim such as Korn/Ferry would do the following:

1.  Determine what property had been stolen or damaged;

2.  Make efforts to restore or ameliorate the property lost or damaged;

3.  Respond to prosecutors' requests to produce documents and witnesses as necessary for the prosecution of the crime; and

4.  Cooperate with the prosecution in detailing loss for the Court.

O'Connor Decl., at 6. Given that the investigation and prosecution of this case began in 2005, it is simply unreasonable for Mr. O'Connor to conclude that OMM attorneys should have expended only 181 hours of time to complete all of these tasks. *See id.* at 32-33.

- OMM Billing Rates

Mr. O'Connor states that Korn/Ferry should not be compensated for choosing OMM – which he describes as a "premium" law firm – to deal with the U.S. Attorney's Office and the FBI. *See* O'Connor Decl., at 8-11. Mr. O'Connor does not cite any authority to support his proposition. Moreover, other courts have not penalized victims for their choice of legal representation. For example, in the *United States v. Gupta* insider trading case in the Southern District of New York, the court considered victim Goldman Sachs' claim under the MVRA for more than $6.9 million in legal fees that it paid to the law firm Sullivan & Cromwell LLP. *See* Ex. 6, at 2. Although the court reduced the fee award to $6.2 million, it did ***not*** do so based on any problem it found with Sullivan & Cromwell's billing rates.[3]

- Nosal's Proposed 70% Reduction

Mr. O'Connor also suggests reducing the fees by 70% on the theory that the mail fraud counts and several computer intrusion counts were dismissed before trial. O'Connor Decl., at 12-13. The government previously responded to this argument. *See* Doc. 495, at 9:5-10:10 & n.5. In the *Gupta*

---

[3] Rather, Judge Rakoff reduced the award based on his identification of time entries that (1) related to post-conviction deposition preparation for civil cases and (2) included a number of attorneys that "exceeded what was reasonably necessary under the MVRA." *Id.* at 10. The court found that these entries amounted to about 9% of Sullivan & Cromwell's total bill. Out of abundance of caution, the court reduced the bill by 10%. *Id.*

case, the court considered Gupta's argument that Goldman Sachs was not entitled to restitution because Gupta was acquitted of certain counts. Relying on the *Boyd* case cited in the government's January 3 memorandum (Doc. 495), the *Gupta* court rejected this argument. Ex. 6, at 8. Although the defendant cites contrary case law, *see, e.g.*, *Hensley v. Eckerhardt*, 461 U.S. 424 (1983), that case law relates to non-restitution-related, fee-shifting statutes.

- Other Objections

Nosal also raises a host of other objections, including that the OMM bills are not sufficiently detailed, that the redactions regarding entries related to the civil litigation and arbitration are improper, and that some of the entries relate to Korn/Ferry "lobbying." O'Connor Decl., at 14-19. None of these objections have merit.

*First*, the entries appear to comply with normal billing practices in the legal industry. They are generally broken down into fairly specific tasks and identify the attorney performing the task, the amount of time spent on each task based on six-minute increments, and the amount of money billed to and paid by Korn/Ferry. For the Court's benefit, Korn/Ferry has also provided in Column F a code that corresponds to one of 9 codes describing the kind of work performed. Exhibit 4 attached hereto contains a list of those codes. (A tenth code, Code 0, was used for entries for which Korn/Ferry is no longer seeking restitution. The United States will submit a separate spreadsheet containing the entries corresponding to that code.) In the *Gupta* case, Goldman Sachs submitted 542 pages of billing records apparently containing a similar level of detail. *See* Ex. 6, at 3. The court found that Goldman Sachs had "provided a voluminous disclosure of its legal fees," that Gupta had "raised no colorable challenge to the veracity of the records," and that the time entries provided by Goldman Sachs "specify the work performed with sufficient particularity to assess what was done, how it was done, and why it was done." *Id.* at 9-10; *see also United States v. Bahel*, 662 F.3d 610, 648 (2d Cir. 2011) (finding that billing records of "major New York City law firm," submitted by victim two days before hearing on restitution, were alone sufficient to support the victim's restitution claim for $846,067.03); *United States v. Amato*, 540 F.3d 153, 162-63 (2d Cir. 2008) (victims provided affidavit and 200+ pages of invoices and other documents detailing attorneys' fees and accounting costs of $3,088,466).

*Second*, the defendant may also complain about the redactions in the bills submitted to the Court

in November 2013.  *See* O'Connor Decl., at 17.  To be clear, it is the United States' understanding that Korn/Ferry has redacted entries that relate to matters for which it is not seeking restitution.  (These redacted entries are different than the "Code 0" entries.  It is the United States' understanding that the redacted entries relate to work on matters that relate to the civil suit and arbitration between Korn/Ferry and Nosal.  The entries that remain have not been altered.)  The defendant has put forward no compelling argument for the Court to conclude that these redactions were inappropriate.

*In a related vein*, the defendant continues to argue that the expenses sought by Korn/Ferry in restitution relate to its civil action.  However, a review of the billing entries makes very clear that the OMM expenses for which reimbursement is being sought relate to the criminal investigation and prosecution.  Even if they did not, however, Ninth Circuit case law does not categorically exclude such expenses.  *See United States v. DeGeorge*, 380 F.3d 1203 (9th Cir. 2004) (holding that victim's attorneys' fees incurred in separate civil case were direct result of DeGeorge's criminal conduct; affirming restitution award of $2,872,634.89); *see also United States v. Cummings*, 281 F.3d 1046, 1052 (9th Cir.), *cert. denied*, 123 S. Ct. 179 (2002) (in International Parental Kidnapping Crime Act case, upholding restitution award of about $14,000 for attorneys' fees incurred in related civil proceedings to recover custody of children, where fees "were a direct and foreseeable result of Cummings's improper removal and retention of [the children]"); *id.* at 1053 (distinguishing *United States v. Barany*, 884 F.2d 1255 (9th Cir. 1989)).  Under *DeGeorge* and *Cummings*, Korn/Ferry could have sought reimbursement for the money it spent on attorneys' fees in the civil suit and arbitration proceeding against Nosal, particularly those that it incurred in attempting to recover the property stolen by Nosal.  It has not done so.  It is clearly not an abuse of discretion to conclude that Korn/Ferry's attorneys' fees and investigative costs incurred during its participation in the *criminal* investigation were "a direct and foreseeable result" of Nosal's criminal conduct.  *Cummings*, 281 F.3d at 1052.

*Next*, the defendant has also identified several line items of attorneys' fees as falling within the category of "lobbying."  Based on the United States review of those entries, however, the actions taken by OMM attorneys can fairly be described as falling within "participation" in the investigation or prosecution.  In this vein, the government notes the defendant's claims that Korn/Ferry "encouraged" the government to indict Nosal.  There is, of course, no evidence of such "encouragement."  The only

evidence before the Court is that Korn/Ferry provided information to the U.S. Attorney's Office and the FBI about what are indisputably thefts of information from its computer system. *See* Doc. 476, Ex. 1 thereto (e-mail from Fram Virjee); RT 496:19-21 (Dunn: "We were very concerned that our information would be hidden or destroyed, and wanted to give the government the opportunity to look at that.")  In any event, the government does not act at the direction of private parties and was equally approachable by Nosal's pre-indictment counsel (Joseph P. Russoniello and Steven F. Gruel).

*Finally*, the defendant makes some ado about OMM's bills for reviewing filings and orders in the criminal case, reviewing press coverage of the criminal case, and preparing mock cross-examinations for witnesses.  The government submits that such expenses are recoverable.  However, to the extent that the Court disagrees, the government notes that these expenses account for a small part of the attorneys' fees sought by Korn/Ferry.  By the government's calculation, they constitute approximately $31,446.99. (The United States will submit its calculations in this regard in an under seal filing.)

- Nosal's "Proportionality" Argument

Nosal argues that, in light of the modest Guidelines loss amount found by the Court, the requested restitution award fails under a proportionality analysis.

*As an initial matter*, Nosal's argument is unsupported by case law.  Ninth Circuit law recognizes that "proportionality is inherent in a MVRA restitution order." *United States v. Dubose*, 146 F.3d 1141, 1145 (9th Cir. 1998); *id.* ("Where the amount of restitution is geared directly to the amount of the victim's loss caused by the defendant's illegal activity, proportionality is already built into the order.") (citation and internal quotation marks omitted).  When the courts discuss "loss" in this context, they are not referring to Guidelines loss.  As the United States noted in its January 2014 filing, the Ninth Circuit in *Yeung* used the term "actual losses."  An examination of that opinions shows that the court's use of that term did not relate to the calculation of loss under the Guidelines.  *See Yeung*, 672 F.3d at 603; *see also United States v. Bussell*, 504 F.3d 956, 964 (9th Cir. 2007) (noting that "actual loss" for purposes of restitution "is determined by comparing what actually happened with what would have happened if the defendant had acted lawfully") (brackets and quotation marks omitted).  Accordingly, these cases simply stand for the proposition that a victim should not receive a "windfall" through a restitution award, *i.e.*, "more in restitution than he actually lost." *United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006).

*Second*, the argument runs contrary to the MVRA's goal of providing restitution to victims for the full amount of their losses. In this case, the way forward chosen by Korn/Ferry – *i.e.*, devote employee resources and hire experienced outside counsel to respond to and investigate the intrusions and to respond to government requests for information – was reasonable in light of the circumstances.

*Third*, the Court's Guidelines loss amount calculation was extremely conservative. *See* Doc.503, at 15:28 (noting that Court was adopting "a conservative approach" regarding valuation of stolen information). There is no serious contention that Korn/Ferry placed great value on the information in its Searcher database and on the information stolen during the course of the criminal conduct in this case. As noted above, its actions were appropriate and foreseeable in light of the circumstances.

**D.      Recent Case Law**

Last week, the Supreme Court issued its 5-4 decision in *Paroline v. United States*, 2014 WL 1612426 (S. Ct. Apr. 23, 2014), handing the government a nearly complete victory. Because that case deals with restitution to victims (albeit to those of child pornography offenses), and because the defendant will discuss *Paroline* in his filing, the government provides a short summary here.

Paroline pleaded guilty to possessing child pornography ("CP"), including two images of "Amy," the victim in a widely distributed series of CP images. Under 18 U.S.C. § 2259, all defendants convicted of child exploitation offenses must pay restitution to their victims in the "full amount of the victim's losses." *Paroline* addressed the causal connection required between the defendant's offense and the victim's losses. As developed at the Court, the question had three parts: (1) whether the statute includes a proximate cause requirement (and thus limits recovery for remote or unforeseeable losses); (2) how to determine whether a particular defendant's conduct is a cause-in-fact of the victim's losses; and (3) how to allocate restitution among thousands of offenders.

All members of the Court agreed that the statute requires proximate cause for all six of the statute's loss categories (including, for example, medical and counseling expenses) and not only for the catchall category of "any other losses suffered by the victim as a proximate result of the offense." *See Paroline*, 2014 WL 1612426, at *9-*10. They also unanimously agreed that proximate causation was not at issue on the facts of the case. *See, e.g., id.* at *20 ("I therefore agree with the [majority] that if Paroline actually caused those losses, he also proximately caused them.") (Roberts, C.J., dissenting).

The Court divided over the more difficult question of cause-in-fact. Recognizing that CP victims' injuries result from an "atypical causal process," *id.* at *10, the majority opinion (authored by Justice Kennedy) rejected the traditional but-for causation standard advocated by Paroline. Instead, the Court adopted the government's aggregate-causation theory, based on tort law, that when multiple causes combine to produce an event and no cause is necessary or sufficient, each cause can be said to be one cause-in-fact of the event. *Id.* at *12.

Finally, turning to how much each defendant should pay, the Court rejected Amy's contention that every offender who possessed her images should be liable for the entire amount of her aggregate losses. The Court determined that this approach would require defendants to pay for the harm caused by others, which would both raise fairness concerns under the Eighth Amendment and frustrate the penological purposes of restitution (*i.e.*, forcing defendants to confront the real harm their crimes have caused) because the victim's losses could be paid in full by a small number of defendants, allowing others to avoid restitution. *Id.* at *14-*16. The Court also recognized that contribution is unavailable in this type of case, which increases the harshness of Amy's proposed "pay everything" rule. *Id.* at *14. Instead, the Court concluded that defendants like Paroline should be required to pay part of Amy's losses, and that the size of that portion should be determined by the district court, in the exercise of its discretion. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts will have to exercise "discretion and sound judgment" in fashioning awards. *Id.* at *16-*17. Courts should consider a variety of factors, including the number of defendants caught, likely to be caught, and existing in the world; whether the defendant distributed the images; whether he contributed to their original production; how many images he possessed; and "other facts relevant to the defendant's relative causal role." *Id.* Using these "rough guideposts," courts should determine restitution orders that are neither "severe" nor "trivial." *Id.*

Chief Justice Roberts, joined by Justices Scalia and Thomas, dissented on the ground that, even accepting aggregate causation, the amount of the defendant's contribution to the loss must nonetheless be determined with but-for precision. Regretting that the statute Congress wrote required this result, the dissent encouraged Congress to revisit the issue and draft a restitution statute more tailored to the unique circumstances in CP cases. Justice Sotomayor dissented on the ground that Amy's position was correct

and that every defendant should be liable for the total amount of Amy's losses.

\* \* \*

The *Paroline* decision underscores the fact that, when Congress orders restitution to be paid to victims, the courts strive to achieve that goal. Despite the challenges involved with calculating the proper amount of restitution, the Court in *Paroline* made clear that the lower courts could use their "discretion and sound judgment" to determine the proper amount of restitution in particular cases.

The defendant understandably has a different interpretation of *Paroline*. *Paroline*, however, dealt with a situation in which the victim was harmed by the dissemination of CP images to thousands or tens of thousands of individuals other than Paroline. As *Paroline* noted, the principle of proximate causation precludes liability in situations "where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere *fortuity*." *Id.* at \*7 (emphasis added). Unlike the victim in *Paroline*, in which the harm to the victim was caused by innumerable other individuals, the expenses that Korn/Ferry incurred here grew out of a single conspiracy involving David Nosal. By no means can they be described as a "fortuity," and by no means can the defendant argue that he was not the but-for and proximate cause of those expenses.

The defendant understandably focuses on the Excessive Fines Clause and proximate cause parts of the *Paroline* decision, but the broader principle enunciated by the case is that this Court possesses discretion in achieving the goal of the MVRA. It should exercise that discretion here.

### III. CONCLUSION

The Court presided over the trial of this matter, and heard testimony from three Korn/Ferry employees (Caroline Nahas, Peter Dunn, and Marlene Briski). As part of the sentencing process, the Court has been presented with abundant briefing regarding the restitution issue. This briefing has included submission to the Court of the redacted voluminous bills that Korn/Ferry received from OMM. The Court is now being provided with Excel spreadsheets that categorize each of those billing entries, and the Court has abundant evidence before it from which it may make a restitution determination.

For the reasons set forth above and in the United States' prior filings (including Docs. 476 and 495), the United States requests that the Court order Nosal to pay restitution to the victim Korn/Ferry in the total amount of $1,240,024.65, which is comprised of (1) $27,400 for response costs; (2) $247,695

for the value of Korn/Ferry employee time spent responding to government requests for information, meeting with investigators, and attending the trial; and (3) $964,929.65 in OMM legal fees.

DATED: April 28, 2014                          Respectfully submitted,

                                               MELINDA HAAG
                                               United States Attorney


                                               _____/s/_____
                                               KYLE F. WALDINGER
                                               MATTHEW A. PARRELLA
                                               Assistant United States Attorneys

                                               JENNY C. ELLICKSON
                                               Trial Attorney